JOSEPH MILES, )
)
    Petitioner, )
)
v. )    NO. 3:07-1098
)    JUDGE HAYNES
RICKY BELL, WARDEN )
Riverbend Maximum Security Prison, )
)
    Respondent. )

## M E M O R A N D U M

Petitioner, Joseph Miles, filed this action under 28 U.S.C. § 2254 seeking the writ of

habeas corpus to set aside his state court conviction of second degree murder for which he

received a sentence of forty (40) years. After a review of the petition, the Court appointed the

Federal Public Defender to represent Petitioner and granted leave to file an amended petition. In

his amended petition, Petitioner asserts the following claims:

1.     The State's evidence was insufficient, as a matter of law for a second
degree murder conviction.

2.     Petitioner's sentence was excessive and contrary to law.

3.     Petitioner's trial counsel was ineffective for failing to call certain
witnesses; to offer proof on Petitioner's theory of self defense; to object to
the all white jury; and to present medical proof of Petitioner's mental state
at the time of the shooting.

4.     In violation of the Sixth and Fourteenth Amendments to the United States
Constitution, the state withheld material and exculpatory evidence.

5.     The state knowingly presented false testimony in violation of the Sixth
and Fourteenth Amendments.

6. The prosecutor's closing argument remarked on Petitioner's decision not to testify in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

7. Petitioner, an African-American, was tried and convicted by an all-white jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

8. The trial court instruction on the knowing element of second-degree murder violated the Sixth and Fourteenth Amendments to the United States Constitution.

9. By a preponderance of the evidence, the court enhanced Petitioner's sentence in violation of the Sixth and Fourteenth Amendments.

10. An appellate Judge improperly participated in the Tennessee Court of Criminal Appeals ruling on Petitioner's state habeas petition.

11. The cumulative errors at Petitioner's trial render his conviction a violation of due process.

(Docket Entry No. 20).

In response, Respondent contends that most of Petitioner's claims were not presented to the state court and those claims are procedurally defaulted. (Docket Entry No. 21 at 11-13). As to Petitioner's exhausted claims, Respondent argues that the state courts' rulings on those claims were reasonable under applicable federal precedents.

## A. Discovery and Hearing Requests

Petitioner seeks discovery about the jury selection process at his trial and asserts that an evidentiary hearing is necessary on his ineffective assistance of counsel and actual innocence claims. Respondent argues that Petitioner could have, but did not pursue discovery on his jury selection claim in the state courts and that an evidentiary hearing was held in the state courts on Petitioner's ineffective assistance claims. Further, Respondent asserts that most of Petitioner's ineffective assistance of counsel claims are procedurally defaulted.

Rule 6(a) of the Rules Governing Section 2254 Actions provides a good cause standard for discovery.

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

In Bracy v. Gramley, 520 U.S. 899, 908-909 (1997), the Supreme Court described the standard for good cause under Rule 6(a) as "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)). Accord Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004).

Petitioner argues that as an initial petition involving a death sentence, he is entitled to discovery to discern any constitutional violations in his conviction and sentence. If this were the initial proceeding, the Court is inclined to agree, but Petitioner has had two extensive proceedings in the state courts with opportunities for discovery.  In addition, the law in this Circuit as stated in Stanford v. Parker, 266 F.3d 442 (6th Cir. 2001) is that there is not an automatic right to discovery.

> Habeas petitioners have no right to automatic discovery. A district court has discretion to grant discovery in a habeas case upon a fact specific showing of good cause under Rule 6. See Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); Byrd v. Collins, 209 F.3d 486, 515-16 (6th Cir. 2000) . . . The burden of demonstrating the materiality of information requested is on the moving party. See Murphy v. Johnson, 205 F.3d 809, 813-15 (5th Cir. 2000).

> The district court applied the correct legal standard in light of the evidence and the state court proceedings. The discovery sought by Stanford would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor.  To the contrary, Stanford's requested discovery, when reviewed in light of the recently examined record, falls more in the category of a fishing

expedition. We will not find that a district court erred by denying a fishing
expedition masquerading as discovery.

Id. at 460.

"Conclusory allegations are not enough to warrant discovery under Rule 6 of the Federal
Rules Governing Section 2254 Petitions; the petitioner must set forth specific allegations of
fact." Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994). In addition, discovery is
unavailable "where undisclosed evidence merely furnishes an additional basis on which to
challenge a witness whose credibility has already been shown to be questionable or who is
subject to extensive attack by reason of other evidence, the undisclosed evidence may be
cumulative, and hence not material." Williams v. Bagley, 380 F.3d 932, 976-77 (6th Cir. 2004)
(quoting Byrd v. Collins, 209 F.3d 486, 518 (6th Cir. 2000). In this regard, the state courts'
determinations of the facts are entitled to a statutory presumption of correctness, 28 U.S.C. §
2254(e)(l) and with certain exceptions, this Court's review is limited to "the evidence presented
in the State court proceeding." 28 U.S.C. § 2254(d).

Discovery requests must also be considered in the context of 28 U.S.C. § 2254(e)(1) on
the presumptive correctness of state court finding.

> Because Petitioner failed to rebut the statutory presumption of correctness that the
> federal habeas court must award to the factual findings of the state courts, the
> district court properly concluded that it was required to defer to those factual
> findings. Furthermore, given this conclusion, we would be hard-pressed to say
> that the district court abused its discretion in denying further discovery on these
> issues.

Byrd, 209 F.3d at 516. See also Moen v. Czerniak, No. Civ.02-10-JE, 2004 WL 1293920 at *1
(D. Or. June 10, 2004) ("Discovery under Rule 6 must be considered in light of the provisions of
28 U.S.C. 2254(e)(2) which limit the scope of federal habeas corpus review to the state court
record except [in] certain specified circumstances. . .").

Also relevant is consideration of the habeas petitioner's failure to utilize any available

state discovery procedures.  In Byrd, the Sixth Circuit stated:

> We find nothing in the record to indicate that Petitioner's counsel otherwise
> utilized the August 5th order or Ohio Rev.Code § 149.43 to pursue further
> discovery.  Counsel claims that, on an undisclosed date, he met with an employee
> of the Ohio Auditor of State to discuss a "Furtherance of Justice Account" and
> was informed that the Hamilton County Auditor's Office would have audit
> oversight responsibility for the prosecutor's disbursements from such an account.
> There is no indication whatsoever that, after receiving such information, counsel
> either attempted to obtain these records from Hamilton County or pursue a public
> records action.

209 F.3d at 507.  As discussed infra, Tennessee law on post-conviction proceedings provide

ample overview for discovery.

For Petitioner's request for an evidentiary hearing, in the Antiterrorism and Effective

Death Penalty Act, ("AEDPA"), Congress redefined the standards for conducting an evidentiary

hearing in a habeas action:

> If the applicant has failed to develop the factual basis of a claim in State court
> proceedings, the court shall not hold an evidentiary hearing on the claim unless
> the applicant shows that - (A) the claims relies on - (i) a new rule of constitutional
> law, made retroactive to cases on collateral review by the Supreme Court, that
> was previously unavailable; or (ii) a factual predicate that could not have been
> previously discovered through the exercise of due diligence; and (B) the facts
> underlying the claim would be sufficient to establish by clear and convincing
> evidence that but for constitutional error, no reasonable fact-finder would have
> found the applicant guilty of the underlying offense.

28 U.S.C.§ 2254(e)(2).

In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court explained that if the

petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence the

focus is on whether the petitioner or his counsel knew of the matters at issue and failed to pursue

the matter:

> The question is not whether the facts could have been discovered but instead
> whether the prisoner was diligent in his efforts . . . Diligence for purposes of the

opening clause [of Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

\*    \*    \*

For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must to diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.

\*    \*    \*

Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

As we hold there was a failure to develop the factual basis of this Brady claim in state court, we must determine if the requirements in the balance of § 2254(e)(2) are satisfied so that petitioner's failure is excused . . . upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error.

Id. at 435, 437, 439-440.

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary hearing in a habeas action. Abdur'Rahman v. Bell, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." Id. at 705. Such hearings are set "to settle disputed issues of material fact." Id. at 706. Yet, "if [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and ordinarily should accept the facts as found in the hearing, but [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to

receive evidence bearing on the applicant's constitutional claim." Id. (quoting Townsend v.

Sain, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an

inadequate record exist, on a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60

(6th Cir. 1986).

Even prior to ADEA, a habeas petitioner had to show cause for his failure to develop the

state record or that "a fundamental miscarriage of justice would result from failure to hold an

evidentiary hearing." Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the

distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a

petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the

inherent authority to order a hearing [that] is still intact following Williams." Abdur'Rahman,

226 F.3d at 706. Evidentiary hearings have been held to be appropriately denied where the

habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder

finding him guilty of the underlying offenses . . . We therefore conclude that the district court did

not abuse its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell,

420 F.3d 614, 626-27 (6th Cir. 2005).

Moreover, the Supreme Court and the Sixth Circuit have observed that: "The state court

is the appropriate forum for resolution of factual issues in the first instance, and creating

incentives for the deferral of factfinding to later federal-court proceedings can only degrade the

accuracy and efficiency of judicial proceedings." Keeney, 504 U.S. at 9. Accord Byrd v.

Collins, 209 F.3d 486, 516-17 (6th Cir. 2000) (quoting Keeney, 504 U.S. at 9). More recently,

the Supreme Court stated "[W]e have made clear that whether a state court's decision was

unreasonable must be assessed in light of the record the court had before it." Holland v. Jackson,

542 U.S. 649, 652 (2004).

After a review of the state court record, Petitioner had the assistance of counsel in the state post-conviction proceedings that included a fair opportunity for discovery on any jury selection issues and to present proof about his trial counsel at his state post-conviction evidentiary hearing, and to explore any other trial related claims. Accordingly, Petitioner's requests for discovery and another evidentiary hearing should be denied.

## B. Procedural History

On May 12, 2998, a jury convicted Petitioner of second degree murder. Miles v. State, 2005 WL 2438392, at *1 (Tenn. Ct. Crim. App. Sep. 26, 2006). The state trial court sentenced Petitioner as a Range II violent offender and on appeal, Petitioner's conviction and sentence were affirmed. State v. Miles, 2001 WL 166368 *1 (Tenn. Ct. Crim. App. June 18, 2001). Petitioner filed a state post-conviction that was denied by the state trial court and affirmed on appeal. Miles, 2005 WL 2438392, at 7.

While his post-conviction appeal was pending, Petitioner filed a motion to reopen his original post-conviction petition in the state trial court relying on Blakely v. Washington, 542 U.S. 296 (2005) that the trial court denied citing State v. Gomez, 163 S.W.2d 632 (Tenn. 2005). Miles v. State, 2009 WL 890892, at *2 (Tenn. Ct. Crim. Cpp. March 26, 2009). Petitioner then filed a second motion to reopen, citing Apprendi v. New Jersey, 530 U.S. 446 (2000) and the trial court denied that motion. On appeal, the Tennessee Court of Appeals affirmed on state law procedural grounds. Id. at *3.

## C. Review of the State Record

In Petitioner's direct appeal decision, the Tennessee Court of Criminal Appeals made extensive findings of the fact[1] about Petitioner's conviction.

> On December 22, 1995, Antwaun Elliott was shot to death by Defendant in the lobby of an Arby's restaurant in Springfield, Tennessee. Defendant's action was the last in a series of antagonistic encounters between Defendant and Elliott because of an affair that occurred between Elliott and Defendant's wife while Defendant was incarcerated. Defendant's wife gave birth to Elliott's child while Defendant was still in prison. During an encounter between the two men after Defendant's release, Elliott shot Defendant in the arm. After an investigation, the State negotiated an agreement with Elliott, reducing his charge from aggravated assault to simple assault and releasing him on probation subject to judicial diversion. Defendant contends on appeal that the State's leniency regarding Elliott's punishment inadequately protected Defendant and, further, that the State's treatment of Elliott points to a conspiracy between representatives of the State and his wife to kill Defendant. Defendant also claims on appeal that after he was denied justice by the State, his only recourse was to shoot Elliott in self-defense.

> Defendant did not testify at his trial. At the sentencing hearing, Defendant gave an opening statement to the court which claimed, among other things, that in December 1995 the District Attorney's office and the Springfield Police Department were involved in a conspiracy against him. Specifically, Defendant alleged that Assistant District Attorney Dent Morriss, Assistant District Attorney Lance Baker, Detective William Watkins and his ex-wife, Lisa Groves, collaborated to have him killed. Defendant claimed that Groves conveyed false stories to Elliott which caused Elliott to fear Defendant and to believe that Defendant wanted to harm Groves. At the same time, Groves told Defendant that Elliott wanted to shoot him. As a result, Defendant became afraid for his life. To protect himself, Defendant turned himself in to the authorities, Morriss and Watkins, hoping to be placed in custody for his parole violations. However, they did not put him in jail. Defendant claimed that instead, they left him free so that Elliott could shoot him. At this point Elliott had already shot Defendant once. According to Defendant, the State intended for Elliott to finish the job.

> Eric Miles, Defendant's cousin, testified at trial that on December 22, 1995, Defendant called him because he wanted Miles to give him a ride. When Miles and his wife picked up Defendant, he had two guns with him. Miles did not ask Defendant what he planned to do with them. Next, Defendant said he wanted to go to his father's house for bullets. Miles dropped him off, then picked him up on another street. When Defendant got back into the car, he lit up a cigarette

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action. <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

containing crack cocaine. Miles asked him to put it out so Defendant asked permission to smoke the crack in Miles' back yard instead. When Miles asked Defendant why he was smoking crack, Defendant replied "to keep himself numb."

As they passed a bowling alley, Defendant asked Miles to stop so that he could get out and talk with a man named "Kilo." Miles pulled up behind the car that Defendant pointed to, and Defendant exited Miles' car. Miles was distracted for a moment until his wife asked, "What is Joseph doing?" When he looked up, he observed Defendant and a boy running back and forth by a little blue car which was parked by the gas pump when they arrived. Defendant had a gun in his hand. When the boy ran across the road toward Arby's, Defendant shot at him then returned to Miles' car for his cigarettes and the other gun. Defendant said "I'll see you later, Cuz," then drove to Arby's in the little blue car. Miles' wife was frightened at this point so they left the scene.

William Watkins, a detective with the Springfield City Police Department, testified that he responded to a call regarding a shooting incident at an Arby's restaurant on December 22, 1995. Watkins arrived at approximately 10 p.m. The victim, Antwaun Elliott, was lying on the floor and being treated by medical personnel. Watkins talked to two eyewitnesses, Billy Joe Dunivan and Lonnie Hampton, who later identified Defendant as the shooter. The next day, Detective Watkins received a phone call from Defendant who admitted shooting Elliott because he was "having trouble with him." Defendant's call came from Arkansas. Afterward, he turned himself in to the Arkansas authorities and returned to Tennessee for trial.

Lonnie Hampton testified that he was present in Arby's when Elliott was shot. The incident occurred at approximately 10 p.m. At the time, Hampton was in line with his cousin ordering food. No other customers were in the restaurant, and the employees were in the back of the building. While Hampton and his cousin were waiting for their order, Elliott quietly entered the lobby behind them. They noticed him enter, but since nothing appeared unusual they paid no further attention to him until a car squealed into the parking lot with its brakes locked. The driver, identified by Hampton as Defendant, jumped out of the car and ran into the restaurant brandishing a revolver. As Defendant came barging through one door, Elliott tried to run out the other but Defendant caught him, pulled him around, and shot him in the head. The gun was only one or two inches from Elliott's head when Defendant fired. Afterward, Defendant ran back to his car and drove off. From what Hampton could tell, Elliott carried no weapons and made no threatening moves toward the shooter-he only tried to get away.

Scarlet Leavell, the mother of the victim, Elliott, testified that Elliott was nineteen years old when he died. He was unmarried with one child which he had with Defendant's wife, Lisa Groves. Elliott was an honor student in high school and had no criminal record except for the charges which resulted when he shot

Defendant. Elliott was sixteen years old and still in high school when he met Lisa. They both worked at Wendy's restaurant. Leavell disapproved of the relationship because Lisa was older than Elliott and married.

Leavell's first contact with Defendant occurred in January 1995 when Defendant called from prison wanting to speak to Elliott. Because she did not recognize his voice, she decided to listen for a while and heard Defendant say that he "was going to deal with [Elliott]." Defendant threatened Elliott again by telephone on March 25, 1995, the day that Lisa and Elliott's baby was born. Leavell reported both calls to the police. Another time, on October 15, 1995 after Defendant's release from prison, Defendant left a message for Elliott that he would be waiting for him when he got off work. Leavell contacted the police and they escorted Elliott home without incident. Additional threats against Elliott and Lisa occurred on October 19, 1995. At around midnight, Defendant came to Leavell's home, banging on the door and threatening to "take them out that night" if he could find them. The above threats occurred prior to Elliott shooting Defendant.

Lisa Groves, Defendant's ex-wife, testified that she met Elliott in 1992 while she was still married and her husband, Defendant, was in prison. Groves and Elliott began a sexual relationship. She gave birth to their son, Bryce, in March 1995. Defendant's friends and family informed Defendant of the affair while he was still in prison and Groves was two or three months pregnant. Groves described Defendant's reaction as "not happy," "violent," and "mad." When Defendant was released in September 1995, Groves informed him that she wanted to be with Elliott. Defendant had a girlfriend by then, and Defendant knew that he and Groves would be no more than friends in the future.

Groves further testified that she recalled the day that Elliott shot Defendant. Elliott had shown up at her parents' house. Shortly thereafter, Defendant also arrived with three men in his car. Groves told them all to leave because she did not want any trouble. Elliott left first, then Defendant followed two or three minutes later. Groves did not see the actual shooting that occurred. Groves also recalled the night when Defendant shot Elliott. She and Elliott were on their way to a Christmas party. Elliott dropped her off at the party, then left to go to the store for a minute. That was the last time Groves saw Elliott alive.

After Elliott was killed, Groves' first contact with Defendant occurred in January 1996. Defendant called Groves and "talked real crazy" to her. Defendant said Elliott "deserved to die because he had tried to kill him. And don't nobody do nothing to him and get away with it." Defendant claimed that he had killed Elliott in self-defense.

Lance Baker, Assistant District Attorney for the 19th Judicial District, testified that he was the prosecutor assigned to handle the State's case against Elliott for shooting Defendant. In preparation, Baker gathered background information on Defendant and Elliott then spoke with Elliott's defense attorney and the officers

involved. As a result of his investigation, Baker reduced the charges against Elliott from aggravated assault, a Class C felony to simple assault, a Class A misdemeanor, with a disposition of judicial diversion pursuant to Tenn. Code Ann. § 40-35-313. His reasons included the fact that this incident was the first reported problem between the two men and appeared that it could be a case of self-defense. Baker had also learned that Elliott had an affair with Defendant's wife while Defendant was in prison and that Defendant began to stalk Elliott after Defendant was released, confronting him repeatedly over a period of months. Baker received conflicting stories from Defendant and Elliott, but the police officers that Baker talked to believed Elliott. All things considered, Baker testified that, in his judgment, there was no doubt that Elliott would have more credibility with a jury. Since a trial on the issue of self-defense would largely hinge on who the jury believed, the State negotiated the plea agreement with Elliott.

Lois Miles, Defendant's mother, testified that she had heard rumors that Elliott was planning to shoot her son. Ms. Miles informed Defendant of the rumors before Elliott actually shot him but did not recall Defendant's reaction. Neither did Ms. Miles remember where she first heard the rumors or who told her about them.

Dr. Anne Durrant, a licensed psychologist, testified that her job included talking with persons who are incarcerated. Defendant was referred to her by a mental health counselor at Defendant's correctional facility. Dr. Durrant met with Defendant on five occasions. Defendant was having difficulty sleeping for personal reasons. Specifically, Defendant was upset with his wife, who had just given birth to a baby fathered by another man. Dr. Durrant opined that Defendant was plagued by a combination of anxiety, depression, some anger, and anhedonia (sudden lack of interest in things previously enjoyed). Defendant also suffered humiliation and embarrassment because of the way his wife treated him. Defendant made no threats against his wife or her paramour during their sessions.

State v. Miles, 2001 WL 166368, at **1, 2, 3, 4. The Tennessee appellate court's other factual findings are set forth in the context of Petitioner's specific claims.

## B. Conclusions of Law

This claim is governed by the provisions of the antiterrorism and effective death penalty act of 1996 ("ADEPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the ADEPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the petitioner's state court conviction became final." Id. at 390; accord Joshua v. Dewitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct

13

unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

## 1. Sufficiency of the Evidence Claim

Plaintiff contends that the Tennessee Court of Criminal Appeals unreasonably applied the standards of Jackson v. Virginia, 443 U.S. 307, 322-25 (1979) in deciding whether the State's proof was sufficient to support a jury verdict of second degree murder. Petitioner's specific contention is that at best, the state's proof established the offense of voluntary manslaughter, given the victim's affair with Petitioner's wife that led to a pregnancy and Petitioner's depression and drug use on the day of the murder.

Under Tennessee law, second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(2) (1997). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997). Voluntary manslaughter is a lesser-included offense of second degree murder. State v. Dominy, 6 S.W.3d 472, 477, n. 9 (Tenn. 1999).

On appeal, the Tennessee Court of Criminal Appeals found that: "Defendant committed a knowing killing. Furthermore, we find no evidence of a state of passion, insane delusion, or any other mental state which would reduce the offense to voluntary manslaughter." Miles, 2001 WL 166386, at *5-*8. The Tennessee appellate court reasoned as follows and distinguished the state precedents relied upon by Petitioner:

> In his brief, Defendant relies on three cases decided by the Tennessee Supreme
> Court to support his request that this Court reduce his conviction from second
> degree murder to voluntary manslaughter: Whitsett v. State, 299 S.W.2d 2 (Tenn.
> 1957); Drye v. State, 184 S.W.2d 10 (Tenn. 1944); and Davis v. State, 28 S.W.2d
> 993 (Tenn. 1930). Defendant's reliance on these cases is misplaced, however, for
> the following reasons.

In Whitsett v. State, 299 S.W.2d 2 (Tenn. 1957), the defendant, Whitsett, shot his wife's lover after he discovered that his wife was having an affair. Our Supreme Court reduced Whitsett's punishable offense from second degree murder to voluntary manslaughter. Here, Defendant seeks to analogize the facts in Whitsett and achieve the same result because, even though the Whitsett defendant suspected his wife's adulterous behavior for approximately eight months before the killing, notice of the possible affair for that length of time did not automatically negate a crime of passion scenario when the defendant's stress and anger continued. However, the underlying facts in Defendant's case are not sufficiently similar to those in Whitsett to cause us to reduce his offense.

Defendant ignores the fact that the defendant in Whitsett only suspected his wife was unfaithful until the morning of the day he shot the victim. After receiving confirmation of his wife's illicit affair, Whitsett appeared relatively calm. In reality, this was not the case. Later, when Whitsett observed the victim driving down the road looking happy while his own life had fallen apart, he lost control of himself. Whitsett chased the victim "with an abandon indifferent of consequences and so reckless as to almost run his truck off the road on more than one occasion...." Id. at 5. While careening down the road, Whitsett loaded the gun he had with him and began to fire wildly, oblivious to the fact that there were innocent people in the vicinity. After Whitsett caught and shot the victim, he proceeded to beat him in the head with the steel barrel of the shotgun, using so much force that he ultimately bent the barrel. The Whitsett court determined that the adequately provoked passion under which the defendant was laboring at the moment he committed the killing was produced by the additional information just furnished him that day. Id. at 6. In other words, when the defendant unexpectedly saw the victim shortly after receiving information correctly apprizing him of her infidelity, he lost his mind. The passion was sufficiently great as to obscure his reason. Id. Under circumstances such as these, "the killing will be reduced to manslaughter," provided the passion has not had time to cool. Id. (quoting Davis v. State, 28 S.W.2d 993, 996 (Tenn. 1930)). Further, the court in Whitsett specifically found that the verdict of murder in the second degree as defined at the time was not sustained by the evidence. Id. at 7.

Comparing the facts in Whitsett to Defendant's case, the instant record contains no evidence that Defendant was not thinking rationally or that he received any new information that might incite passion "sufficient to lead a reasonable person to act in an irrational manner" on the day that he killed Elliott. In contrast to Whitsett, Defendant had received confirmation of his wife's infidelity months beforehand. Moreover, the proof indicates that Defendant did not unexpectedly encounter Elliott as did the defendant in Whitsett, but, instead, that Defendant went searching for Elliott, methodically acquiring guns and ammunition along the way. Unlike Defendant's situation, Whitsett possessed the gun used as the murder weapon for a reason other than to shoot someone. Whitsett was returning the gun to its owner after borrowing it. There was no evidence that Whitsett intended to

shoot anyone prior to the incident. For the above reasons, we find that the cases are significantly dissimilar and, therefore, the court's holding in Whitsett does not help Defendant.

Defendant also cannot rely on the decisions in Drye and Davis because, again, the facts and circumstances deviate substantially from those in Defendant's case. First, in Drye v. State, 184 S.W.2d 10 (Tenn. 1944), the defendant was certifiably insane. The expert in Drye testified that insanity of the defendant's type was "circular," going through alternating periods of depression and remission. Just prior to killing his wife, the defendant was reported to have gone "to pieces." Witnesses testified that he was "nervous" and "shaking all over." His employer likewise testified that he looked like "a wild man." While the Supreme Court conceded that the defendant's reason may have not been so far dethroned as to render the killing excusable, it was clear he did not act with that coolly formed premeditated deliberation which was an essential characteristic of first degree murder. Id. at 12.

Secondly, the Drye court did not reduce the defendant's charge to manslaughter. The court in Drye only found that, while there may not be sufficient provocation to reduce the killing to manslaughter, "still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree." Id. at 13. Put another way, the Drye court went no further than to hold that conviction of the defendant for murder in the first degree was not sustained and, consequently, reversed the trial court's judgment.

Here, Defendant was not declared legally insane during his trial or at any time in his history. We note also that the passion which provoked the Drye defendant was significantly more than that passion evinced in Defendant's circumstances, and still the Drye court did not reduce the charge to voluntary manslaughter. Defendant's reliance on Drye is thus unfounded.

For similar reasons, Davis v. State, 28 S.W.2d 993 (Tenn. 1930), does not support Defendant's argument. The defendant, Dr. Davis, was found to be operating under an "insane delusion" when he killed the man who he falsely believed to be having an affair with his wife. At the conclusion of his trial, the jury found Dr. Davis insane on the subject of the victim's relations with his wife, but nevertheless found him guilty of second degree murder. At the time, Tennessee law required that Dr. Davis be found guilty if he was able to distinguish right from wrong at the time of the crime. The Supreme Court subsequently reversed Dr. Davis' conviction, recognizing the doctrine of insane delusion: "a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed would have excused the defendant." Id. at 996. Because Dr. Davis was so deranged on the subject of his wife's supposed relations that he remained deaf to the voices of reason and conscience, the

Supreme Court found that he was therefore possessed by an insane delusion. And, a defendant acting under such temporary mental stress is presumed to be incapable of malice, a then essential element of murder. Id. at 996.

Unlike Davis, the record in Defendant's case presents no proof that he was acting under any type of "insane delusion" at the time he committed the killing. Defendant's reliance on Davis is therefore misplaced.

The evidence in this case, when viewed in the light most favorable to the State as it must be, supports Defendant's conviction for second degree murder. Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (1997). A person acts "knowingly" with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Id. § 39-11-302(b). The proof adduced at trial established that Defendant prepared to kill Elliott. The evening that Defendant committed the crime, he was armed with two guns. Defendant had his cousin then drive him to a place where he could pick up bullets. When Defendant encountered Elliott, he chased him, fired at him, then returned to Miles' car for his other gun and cigarettes. Immediately afterward, Defendant pursued Elliott to Arby's restaurant where he grabbed him and shot him in the head at close range. Clearly, Defendant committed a knowing killing. Furthermore, we find no evidence of a state of passion, insane delusion, or any other mental state which would reduce the offense to voluntary manslaughter.

Id. at **5-8 (emphasis added).

To state a Fourteenth Amendment claim based upon insufficient evidence, the Supreme

Court in Jackson set forth the standard for reviewing such a claim:

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.** This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.** The criterion thus impinges upon

`jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the <u>Jackson</u> standard of review is satisfied. <u>Id.</u> at 324. The rule concerning reasonable inferences applies with equal force to historical facts. <u>Parke v. Raley</u>, 506 U.S. 20 (1992) (involving the challenge to a prior conviction that resulted in enhancement of a sentence). Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, <u>Wiley v. Sowders</u>, 669 F.2d 386, 390 (6th Cir. 1982) (<u>per</u> <u>curiam</u>). The State's evidence need not remove every reasonable hypothesis except that of guilt. <u>Tilley v. McMackin</u>, 989 F.2d 222, 225 (6th Cir. 1993).

Due process principles extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense, unless the state has made the absence of a defense an element of the crime. <u>See</u> <u>Allen v. Redman</u>, 858 F.2d 1194, 1196-98 (6th Cir. 1988). At that point, sufficiency of evidence on the issue will be relevant. <u>Id.</u> at 1197-98.

The Court deems the Tennessee appellate court's distinction of the facts in Petitioner's conviction from its prior precedents to be reasonable. Given the State's proof that on the evening of the killing, Petitioner armed himself with two weapons, instructed his friend to drive him to get bullets, Petitioner's shooting the victim in the head at point blank range and smoking a cigarette after the firing are consistent with a deliberate and intentional killing. The jury heard actual proof the Petitioner's drug use prior to the killing and received a jury instruction on voluntary manslaughter. 2001 WL 166368 at **2, 6. The jury rejected that defense based upon the State's proof.

After reviewing this evidence in the light most favorable to the State, as required by Jackson, the Court concludes that the Tennessee Court of Criminal Appeals reasonably applied Jackson and this claim is not grounds for habeas relief.

## 2. Petitioner's Ineffective Assistance of Counsel Claims

In his state post-conviction proceeding, Petitioner "filed a petition for post-conviction relief alleging that both his trial counsel and his attorney on appeal were ineffective", but "[i]n [his post-conviction] appeal, the petitioner argues only that trial counsel was ineffective for having failed to call those witnesses identified by the petitioner during the evidentiary hearing." Miles v. State, 2005 WL 2438392, at *4 (Tenn. Ct. Crim. App. Sept. 26, 2005). Petitioner contends that Tennessee appellate court failed to acknowledge Petitioner's amended brief that his trial counsel was ineffective for failing to present evidence establishing Petitioner's claim of self-defense; failing to object to an all-white jury panel; and failing to present evidence respecting Mr. Miles' state of mind at the time of the shooting. (Docket Entry No. 24, Notice of Filing at Addendum 2, Document 2 at 5-8). Because the Tennessee appellate court ignored those claims, Petitioner contends that the court's resolution of his claim was an unreasonable application of federal law.

In its findings on this claim in the post-conviction appeal, the Tennessee Court of Criminal Appeals found the following facts on Petitioner's ineffective assistance of counsel claims as follows:

> After the appointment of counsel, **the petition was again amended to include allegations that trial counsel had been ineffective by failing to call certain witnesses, by failing to fully develop the evidence of the prior shooting incident, by failing to put forth expert testimony regarding the petitioner's state of mind, by failing to object to the all white jury panel, by failing to object to the final argument by the state, by failing to allege self-defense, and by using the assistant district attorney general as a witness for the defense.**

At the evidentiary hearing, not all of the issues were addressed. The petitioner testified that he believed his best theories of defense were voluntary intoxication and self-defense. He claimed that he provided a list of witnesses to his trial counsel that would have been helpful on the latter theory, including Renea Mitchell, who could have testified that the victim had tried to force the petitioner's vehicle into the path of an oncoming vehicle on a prior occasion, and Tammy Johnson, who could have testified that Ms. Groves had once attempted to stab the petitioner in the back. He testified that he had provided his trial counsel with the names of Ruby Brewer, who knew that the victim had followed him on one occasion, and Rodney Brewer, who had been sent to his residence to ask him to meet Ms. Groves. The petitioner also testified that he provided his counsel with the names of Deborah Gardner, who would have testified that Ms. Groves was jealous of his relationship with other women, and James Overby, who had provided him with information that the victim was armed on the night of the shooting. He also claimed that he provided trial counsel with the names of Larry Cook, who had information similar to that of Mr. Overby, and James Maxey, his parole officer, who knew about the conduct of Ms. Groves during his time in prison. The petitioner expressed disappointment that his counsel failed to call any of those prospective witnesses to testify at trial.

The petitioner testified that it was commonly known "on the streets" that one would likely be killed in a feud like this unless there was a pre-emptive strike. It was his opinion that the police department had not adequately protected him after the first shooting. He expressed suspicion that Detective William Watkins had taken a gun from the body of the victim after the shooting and then purposely suppressed the evidence.

The petitioner also complained about the manner in which trial counsel handled the testimony of Lance Baker, the assistant district attorney general who was called as a defense witness, explaining "when he testified at my trial in 1998, everything that he said in Clarksville, they just disregarded it, they just [threw] it away, it didn't exist. He changed his whole testimony." The assistant district attorney general had been called as a witness by the defense to establish that the victim had been charged with aggravated assault and had entered a plea of guilty to a reduced charge of simple assault. The petitioner, who did not testify at his trial, contended at the evidentiary hearing that in this prior incident the victim had followed him in his vehicle and, when the petitioner stopped, walked to his car and fired a single shot into his arm.

**The petitioner testified that he had asked his trial counsel to arrange for a psychological evaluation and, while there was psychological testimony presented on his behalf during the trial, he expressed dissatisfaction with the results. The petitioner also complained that his trial counsel never challenged the all white jury and never asked the trial court for jury instructions on self-defense.**

On cross-examination, the state elicited testimony that Dr. Anne Durrant, a licensed psychologist, had counseled the petitioner on several occasions during his period of incarceration. Although the petitioner had no recollection as to her testimony at trial, the record establishes that she testified that the petitioner was upset because of Ms. Groves's relationship with the victim, that he suffered sleep loss, humiliation, and embarrassment, but had made no threats against either Ms. Groves or the victim during their sessions. The petitioner also acknowledged that he was "drinking and drugging" prior to the shooting. He specifically admitted that he had used crack cocaine just before the murder.

Trial counsel testified at the evidentiary hearing that he had investigated the prior aggravated assault charge against the victim. It was his recollection that the petitioner and four other individuals arrived at Ms. Groves's residence and that the victim, who was there, left but was followed by the petitioner and the four others. He determined that when the victim stopped, the petitioner approached him, and the victim then shot the petitioner in the arm.

Trial counsel explained that he had called the assistant district attorney as a defense witness at the specific request of the petitioner in order to establish that the police had been overly lenient with the victim and to demonstrate police prejudice toward the petitioner. According to counsel, the petitioner wanted the jury to know that the state had reduced the charge and placed the victim on diversion without even talking to him.

Trial counsel also explained that the petitioner, who had four prior felony convictions, chose not to testify. He recalled that the petitioner had been on parole for only five days prior to the shooting. Counsel testified that, according to his investigation, the victim was unarmed at the time he was shot by the petitioner.

As to the voluntary intoxication defense, trial counsel testified that the petitioner's cousin, Eric Miles, who was a state witness, testified that the petitioner was smoking crack "to keep himself numb" just before the shooting. According to the record of the trial, Miles stated that when he objected to the petitioner's use of the illegal drug in his car, the petitioner asked permission to smoke his drugs in Miles's back yard. Miles had also testified at trial that he saw the petitioner shoot at a young male, who was running toward an Arby's Restaurant, and then get into a little blue car and drive to the restaurant after him.

Trial counsel also contended that the only reason that the charge was not first degree murder was because the state had made a mistake in preparation of the indictment, inadvertently omitting an allegation of premeditation. He stated that he was pleased that voluntary manslaughter instructions had been provided to the jury but he conceded self-defense instructions were not.

<u>Miles v. State</u>, 2005 WL 2438392, at **1, 2, 3 (emphasis added).

Based upon these factual findings, the Tennessee Court of Criminal Appeals concluded that Petitioner's counsel's was not ineffective.

At the conclusion of the evidentiary hearing, the trial court denied relief, specifically finding as follows:

(1) The petitioner knowingly and voluntarily chose not to exercise his right to testify, primarily because of his prior criminal history;

(2) trial counsel was not ineffective for having failed to call as witnesses those individuals who might testify that the petitioner was fearful of the victim and had to act preemptively as a matter of self-defense;

(3) trial counsel was not ineffective for having failed to object to a comment by the prosecution, if any such comment was made, on the right of the petitioner to remain silent;

(4) trial counsel was not ineffective for having failed to further develop the testimony about the mental condition of the petitioner;

(5) trial counsel was not ineffective for having failed to develop evidence which would have warranted an instruction of self-defense, particularly in view of the fact that the petitioner chose not to testify; and

(6) there was no basis for trial counsel to object to the racial composition of the jury and no evidence that the petitioner's constitutional rights were violated in that regard.

\* \* \*

**While the post-conviction court allowed the petitioner to provide a summary of what he believed the various witnesses might testify to, if called, none were present at the evidentiary hearing. Thus, there is no proof in this record as to their actual testimony.** Moreover, it does not appear from the record that the post-conviction court was particularly impressed with the proffered evidence. In our view, it was well established that there was a history of discord between the petitioner and the victim. **The statements, if accurate, could have added little to the volatile nature of the relationship between the two men. That the petitioner chose not to testify with four prior felony convictions and having been released from prison only five days before the killing appears to be a wise tactical decision. By all appearances, he would have been an easy target on cross-examination regardless of any number of witnesses who might have had information about the rivalry between the petitioner and the victim. His choice not to testify, however, would have rendered even less helpful much of the supporting evidence the petitioner wanted to introduce through the**

**various witnesses he named for his trial counsel. In summary, the evidence does not preponderate against the post-conviction court's conclusion that the petitioner was unable to establish either deficiency in performance or prejudice in result for the failure to call these witnesses.**

**The fact that the petitioner chose not to testify also hampered his chances for a self-defense instruction to the jury**. The testimony of the assistant district attorney general about the prior shooting incident served as little hope. Although the petitioner suffered a gunshot wound in the prior incident and the victim was arrested for aggravated assault, the assistant district attorney general, while corroborating the shooting, explained that the petitioner and four other individuals initiated the confrontation with the victim at Ms. Groves's residence. He testified that the victim left and that the petitioner followed, accompanied by the four other men. The assistant district attorney general related that his investigation suggested that it was the petitioner who approached the victim, apparently in a threatening way, and then the victim shot the petitioner in the arm. He explained that self-defense was plausible, thus resulting in a reduced charge to simple assault with placement on judicial diversion. It was a first offense for the victim, who was nineteen years old at the time and, by comparison, the petitioner had a significant prior felony record.

The evidence at trial and the evidentiary hearing established that the petitioner saw the victim at a service station, armed himself, and fired a shot in his direction. He pursued the victim into an Arby's Restaurant, grabbed him, and shot him in the head from close range. The victim was unarmed. Despite any number of previous altercations between the petitioner and the victim, these undisputed facts placed an unusual burden on trial counsel to manufacture a viable self-defense claim. A voluntary manslaughter conviction would appear to have been the most optimistic verdict possible. In our view, the evidence does not preponderate against the findings of the post-conviction court that the circumstances did not warrant a self-defense charge. The petitioner produced nothing at the evidentiary hearing to indicate otherwise.

There is no constitutional requirement that juries mirror the community or reflect the various distinctive groups within the population. Taylor v. Louisiana, 419 U.S. 522, 538 (1975). To establish an improper jury venire, one must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

State v. Nelson, 603 S.W.2d 158, 161 (Tenn. Ct. Crim. App. 1980) (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)). No person has a constitutional right to be tried by a jury of his own race, either in whole or in part. Harvey v. State, 749 S.W.2d 478, 481 (Tenn. Ct. Crim. App. 1987); see also Wheeler v. State, 539 S.W.2d 812, 815 (Tenn. Ct. Crim. App. 1976). The mere fact that there were no African Americans on the jury is not proof of a violation of any right. Harvey, 749 S.W.2d at 481. There was simply no evidence offered at the post-conviction hearing that the selection process was unconstitutional, only a complaint to trial counsel that the jury was entirely white.

It may be a violation of equal protection for the state to remove black jurors from a jury. The burden is first on the accused to make prima facie showing of the use of peremptory challenges to exclude a cognizable racial group and, once met, the burden then shifts to the state to come forward with an acceptable, neutral explanation. See Baston v. Kentucky, 476 U.S. 79, 93-94 (1986). There was no evidence offered by the petitioner that the state had used its peremptory challenges to assure that the jury was entirely white.

Although not argued on appeal, the petitioner contended during the evidentiary hearing that trial counsel was ineffective for having failed to further develop medical proof as to his state of mind at the time of the shooting. The state chose to brief the issue on appeal. Again, however, the petitioner failed to present Dr. Durrant or any other expert to testify at the evidentiary hearing. It is incumbent upon the petitioner to do so in order to establish either deficiency in performance or prejudice in result. Black, 794 S.W.2d at 757-58.

Accordingly, the judgment of the trial court is affirmed.

Miles, 2005 WL 2438392, at *4-5, 6-7 (emphasis added).

In addition, Petitioner contends that the state appellate court's requirement that Petitioner "must produce the witness at his post-conviction hearing (and) elicit both favorable and material testimony from the witness," id. at *5, is an unreasonable application of the Strickland standard. Petitioner asserts that Strickland does not require proof from the actual witness to establish his claims and such requirements would foreclose any opportunity for habeas relief where the missing witness had died between the trial and the post-conviction proceeding or was otherwise unavailable.

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain

> investigations would be fruitless or even harmful, counsel's failure to pursue
> those investigations may not later be challenged as unreasonable. In short,
> inquiry into counsel's conversations with the defendant may be critical to a proper
> assessment of counsel's investigation decision, just as it may be critical to a
> proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000 WL 712376, at *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

The Sixth Circuit summarized Supreme Court precedents and identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2) counsel whose performance was deficient on specific issues and that deficiency was demonstrably prejudicial to the defendant. As the Sixth Circuit explained:

> In Cronic[1], the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams[2], the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel.

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir. 2003) (citations and parenthetical omitted).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742. Petitioner's claim does not fall within any of these categories and thus, a "strong presumption" arises that petitioner's counsel provided reasonably effective assistance.

Strickland, 466 U.S. at 689.

---

[1]  United States v. Cronic, 466 U.S. 648 (1984).

[2] Williams v. Taylor, 529 U.S. 362 (2000).

First, contrary to Petitioner's legal contention, <u>Strickland</u> has been applied to require proof from a witness of what the witness could have testified to, if defendant's counsel had called the witness. See <u>Stewart v. Wolfenberger</u>, 468 F.3d 338, 353 (6th Cir. 2006). Moreover, such proof would be necessary to prove the prejudice element of <u>Strickland</u>. Here, there is not any showing of critical defense witnesses who have since died or were available. The state trial court permitted Petitioner to proffer what those witnesses would have testified to and deemed Petitioner's proffer inadequate. The state court noted that Petitioner's testimony was crucial to his claim of self defense and for strategic reasons, Petitioner elected not to testify. As the State appellate court found, Petitioner, with his trial counsel, made a strategic decision not to testify given Petitioner's lengthy criminal history of convictions and recent release from prison.

Moreover, the State appellate court expressly considered the jury selection issue and found "[t]here was simply no evidence at the state post-conviction hearing that the selection process was unconstitutional" and "no evidence offered by the petitioner that the State has used its preemptory challenges to assure that the jury was all white." 2005 WL 2438392, at *6-7.

As to Petitioner's counsel's cited failure "to further develop medical proof as to [Petitioner's] state of mind at the time of the shooting. . . . . Again, "[P]etitioner failed to present Dr. Durrant or any other expert to testify at the evidentiary hearing. It is incumbent upon the petitioner to do so in order to establish either deficiency in performance or prejudice in result." <u>Id.</u> at 7. Moreover, the trial court proof reflects that while in treatment with Dr. Durrant, Petitioner never threatened to kill the victim. <u>Miles</u>, 2001 WL 166368, at *4.

Given <u>Strickland's</u> requirement of actual prejudice, the Court concludes that from the evidence in the state record, the Tennessee courts' rulings on Petitioner's ineffective assistance

of counsel claims are not unreasonable. The Court thus concludes Petitioner's exhausted claims about his trial counsel lack merit.

### 3. Defaulted Claims

As to his unexhausted claims, Petitioner had a state evidentiary hearing with the assistance of counsel and did not present his remaining ineffective assistance of counsel claims. Petitioner's other unexhausted claims are that the State knowingly presented false testimony; that the State withheld material and exculpatory evidence; that the State prosecutor's closing argument commented upon Petitioner's decision not to testify; that Petitioner's trial before an all white jury violates his Sixth Amendment right to a jury and his Fourteenth Amendment right to due process; that the trial court jury instruction on the knowing element of second-degree murder violates due process; that the trial courts' use of the preponderance of the evidence to enhance Petitioner's sentence violates the Sixth and Fourteenth Amendments; and that Judge Wedemeyer's presence on the Tennessee appellate court affirming the dismissal of his State habeas petition violated the United States Constitution because Judge Wedemeyer was the trial judge at Petitioner's second-degree murder trial.

Petitioner must exhaust all claims in state court before asserting those claims in a federal habeas action. Wilwording v. Swenson, 404 U.S. 249, 250 (1971). A habeas petitioner must present claims to the state courts as federal constitutional issues rather than state law issues. Picard v. Connor, 404 U.S. 270, 275 (1971). The facts and federal legal theory raised in a petition for the federal writ of habeas corpus must have been "fairly presented" to the state courts. Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (citing Picard and Anderson v. Harless, 459 U.S. 4, 6 (1982) (per curiam) ("It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim

was made." "[A] federal habeas petitioner ... [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.") A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. Harless, 459 U.S. at 7-8 n. 3. The state courts must be provided with a "fair opportunity" to apply controlling legal principles to the facts bearing upon the petitioner's constitutional claim. Id. at 6.

"[T]he doctrine of exhaustion requires that a claim be presented to the state courts **under the same theory in which it is later presented in federal court.**" Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998) (emphasis added). As a matter of federal law, to avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. Covington v Mills, 110 Fed. Appx. 663, 666 (6th Cir. 2004).

Upon review of the state records, the Court agrees that the claims listed above are unexhausted. Because these claims are unexhausted, Respondent contends that these claims are also procedurally defaulted and cannot be considered for habeas relief given the state's one year limitation period for state post-conviction claims, Tenn. Code Ann. § 40-30-102.

The "Procedural Default Doctrine" bars consideration of a federal claim in a habeas action that was not presented to the state court or was decided on state law grounds.

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would, therefore, be advisory. . .

> . . . the doctrine applies also to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural ground.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1992) (emphasis added and citations omitted).

Yet a presumption of no procedural default arises if the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of [the] state law ground is not clear from the face of the opinion." Id. at 735. Further, this doctrine applies only to "firmly established" and regularly followed state procedural rules. Ford v. Georgia, 498 U.S. 411, 423-24 (1991). Here, Respondent cites Tenn. Code Ann. § 40-30-102 (a) and (c) that has a one year limitation period that has long since passed for presenting any of these claims and State precedent on appellate waiver.

The standard analysis for procedural default was set forth by the Sixth Circuit in the oft-cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> * * *
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction.
>
> * * *
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.... This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Maupin, 785 F.2d at 138 (citations omitted).

## "Firmly Established" and "Regularly Followed" State Rules

To qualify for the procedural default rule, the cited state law also must be a firmly

established and regularly followed state practice. Ford, 498 U.S. 411 at 423-24 (1991). In

Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of

limitations statute on post-conviction petitions and its Burford exception in a procedural default

analysis:

> Hutchison argues that Tennessee courts' willingness to excuse procedural default
> pursuant to Burford demonstrates that state procedural rules are not regularly
> followed in the context of later-arising claims.
>
> Nevertheless, we agree that Tennessee's due process exception does not render
> this provision inadequate. Tennessee's due process exception does not grant
> unfettered discretion to state courts in applying procedural default rules.
> Although Tennessee courts will often permit the hearing of an untimely claim, the
> decision is confined by the due process standards delineated in Burford and its
> progeny. The Tennessee courts consistently enforce a procedural scheme that
> encompasses both the one-year limitations period and a court-recognized
> procedure for tolling that statute when specific due process grounds are
> presented....
>
> In Hannah v. Conley, 49 F.3d 1193 (6th Cir. 1995) (per curiam), this Court found
> that the then-applicable three-year statute of limitations for post-conviction
> petitions in Tennessee was regularly applied and would bar presentation of an
> unexhausted claim. Id. at 1197. The Hannah court noted that the language of the
> statute was mandatory in that it provided that a claimant "must" petition within
> three years or his claim "shall" be barred. Id. at 1196. The current one-year
> statute of limitations contains the same mandatory language. See T.C.A. § 40-30-
> 202(a).
>
> Although the previous cases did not present a Burford type later arising claim, we
> do not find that the state's Burford tolling rules command a different result. . . .
>
> Given that tolling under Burford is not discretionary and given this Circuit's
> reluctance to discourage state courts from exhibiting caution before applying
> procedural default rules in capital cases, we conclude that the Burford exception
> does not render Tennessee's procedural rules inadequate.

Id. at 738-739. (footnotes omitted).

The Sixth Circuit also ruled in <u>Hutchinson</u> that despite the <u>Burford</u> exception to the Tennessee timeliness rule, Burford was not a separate constitutional claim.  <u>Id.</u> at 740-41. In a word, <u>Hutchinson</u> found the Tennessee limitations rule to constitute a firmly established and regularly followed state law. Thus, the Court concludes that Tennessee's limitations statute is an independent and regularly enforced state rule.

## Adequacy of the State Rule

The Supreme Court recognized the following state interests as constituting adequate grounds for state procedural rules.

> The possible avoidance of an unnecessary trial or of a retrial, the difficulties of making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, and the potential disruption to the numerous convictions of finding a defect in a grand jury only after the jury has handed down indictments in many cases.\

<u>Coleman</u>, 501 U.S. at 745-46.

Another reason to support a finding of adequate state rules was decided in <u>Frances v. Henderson</u>, 425 U.S. 536 (1976), where the Supreme Court enforced a state rule that promoted finality, noting a comparable federal rule.

> Plainly the interest in finality is the same with regard to both federal and state prisoners. ... There is no reason to ... give greater preclusive effects to procedural default by federal defendants than to similar defaults by state defendants.  To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

<u>Id.</u> at 541-42.

Procedural rules such as statutes of limitations have been found to be independent and adequate.  In <u>Coleman</u>, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals.  501 U.S. at 750-51. In <u>Brown v. Allen</u>, 344 U.S. 443 at 485-86 (1953), the Court also applied the procedural default

rule to a state rule that placed time limits on appellate rights.  Accord Reed v. Farley, 512 U.S.

1277 (1994) (denying writ due to waiver of delay under the Interstate Agreement on Detainers

by failure to object at trial and to establish prejudice).  Moreover, State rules that failure to object

at trial to preserve a claim is also an adequate State rule.  Wainwright v. Sykes, 433 U.S. 72, 86-

87, 91 (1977).

The Court concludes that Tennessee's limitation statute represents an adequate state

interest for procedural default purposes and is regularly enforced.

## Cause and Prejudice

Given these procedural defaults, Petitioner must establish cause and prejudice to excuse

such non-compliance.  The "cause" for the default must be external to the petitioner and must

otherwise be attributable to the state.

> . . . we think that the existence of cause for a procedural default must ordinarily
> turn on whether the prisoner can show that some objective factor external to the
> defense impeded counsel's efforts to comply with the State's procedural rule.
> Without attempting an exhaustive catalog of such objective impediments to
> compliance with a procedural rule, we note that a showing that the factual or legal
> basis for a claim was not reasonably available to counsel, see Reed v. Ross, 468
> U.S., at 16, or that `some interference by officials,' Brown v. Allen, 344 U.S. 443,
> 486 (1953), made compliance impracticable, would constitute cause under this
> standard.

Carrier, 477 U.S. at 488 (emphasis added).

An often cited factor to establish cause for a procedural default is the petitioner's state

counsel's failure to raise an issue or to comply with a state law to present a given habeas claim.

Inadequate counsel can prove cause, but only if counsel's conduct violates Sixth Amendment

standards and counsel's inadequate conduct has been presented to the state courts.  The Supreme

Court emphasized in Coleman that mere attorney error cannot be cause and cannot be

attributable to the state.

> Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.' ... Attorney error that constitutes ineffective assistance of counsel is cause, however ... as Carrier explains, 'if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state.' [quoting Carrier, 477 U.S. at 488]. In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., 'imputed to the state.'

Coleman, 501 U.S. at 753-54 (emphasis added).

As noted earlier, the standard for cause attributable to counsel is the constitutional standard under the Sixth Amendment for attorney performance, *i.e.*, whether counsel provided "reasonably effective assistance," Carrier, 466 U.S. at 687, and counsel's performance must be both inadequate and prejudicial to the defense.

For the reasons stated on Petitioner's ineffective assistance of counsel claims, the Court concludes that Petitioner has not demonstrated cause for his trial counsel's failures to present his defaulted claims to the State courts. This same rationale leads the Court to conclude that Petitioner has not established prejudice for these defaults. To the extent state post-conviction counsel's omissions caused claims not to be presented, such omissions cannot establish cause. Coleman, 501 U.S. at 756-57.

To be sure, the procedural default doctrine may not preclude federal habeas review if failure to hear the petitioner's defaulted claim would result in a fundamental miscarriage of justice or would prove his actual innocence of the offense. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). If there were an error-free trial and the actual innocence claim was based upon newly discovered evidence, then the petitioner's showing of actual innocence must be "truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the

lack of an available state remedy. <u>Herrera v. Collins</u>, 506 U.S. 390, 427 (1993). These is not any showing of a miscarriage of justice here.

Actual innocence claims must be substantive or factual, not procedural, *e.g.*, a claim of innocence based on ineffective assistance of counsel or a prosecutor's failure to disclose Brady material is procedural and subject to the procedural default doctrine. <u>Schulp v. Delo</u>, 513 U.S. 298 (1995). As the Court in <u>Schulp</u> explained, "if there were no question about the fairness of the criminal trial, a <u>Herrera</u> type claim would have to fail unless the federal habeas court is convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raise sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims." <u>Id.</u> at 317. Where the claim of actual innocence is premised upon a trial with error, then a different and lesser standard of judicial review of "sufficient doubt" applies. As the Supreme Court stated in <u>Schlup</u>.

In <u>Schulp</u>, the Court addressed the standard of proof that a federal petitioner would have to show to establish the actual innocence exception to the procedural default rule in non-capital cases. In contrast, for cases other than death penalty cases, the Court in <u>Schulp</u> applied the standard in its earlier <u>Carrier</u> decision stating,

> [W]e hold that the <u>Carrier</u> "probably resulted" standard rather than the more stringent <u>Sawyer</u> standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

> The <u>Carrier</u> standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."

36

477 U.S. at 496, 106 S.Ct. at 2649-2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary," McCleskey, 499 U.S. at 494, 111 S.Ct. at 1470, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

Several observations about this standard are in order. The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The Carrier standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068. Indeed, even in Sawyer, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under Sawyer, or is deciding whether a petitioner has made the requisite showing of innocence under Carrier, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

Id. at 326-28.

Here, for the same reasons stated on the Petitioner's sufficiency of the evidence claim, the Court concludes that Petitioner has not met the standard under the actual innocence doctrine to excuse his procedural defaults.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___16th___ day of December, 2010

WILLIAM J. HAYNES, JR.
United States District Court